IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Michael E. Kleiber,

      Plaintiff,

      v.                     Case No. 2:04-cv-109

Honda of America Mfg., Inc.,

      Defendant.

OPINION AND ORDER

This is an action filed by plaintiff Michael E. Kleiber against defendant Honda of America Mfg., Inc. ("Honda"), his former employer. Plaintiff asserts claims under the Americans With Disabilities Act ("ADA"), 42 U.S.C. §12101, et seq., alleging that Honda failed to accommodate his disability and terminated his employment due to his disability. Plaintiff also asserts a claim of handicap discrimination under Ohio Rev. Code §4112.02(A), and a claim of wrongful discharge in violation of public policy under Ohio law, referring to §4112.02(A). This matter is before the court on the parties' cross-motions for summary judgment. Honda's motion for leave to file a memorandum in support in excess of twenty pages is granted.

I. Summary Judgment Standards

The procedure for granting summary judgment is found in Fed. R. Civ. P. 56(c), which provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

The evidence must be viewed in the light most favorable to the

nonmoving party. <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144 (1970). Summary judgment will not lie if the dispute about a material fact is genuine, "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). However, summary judgment is appropriate if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). <u>See also</u> <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574 (1986).

The Sixth Circuit Court of Appeals has recognized that <u>Liberty Lobby</u>, <u>Celotex</u> and <u>Matsushita</u> effected "a decided change in summary judgment practice," ushering in a "new era" in summary judgments. <u>Street v. J. C. Bradford & Co.</u>, 886 F.2d 1472, 1476 (6th Cir. 1989). The court in <u>Street</u> identified a number of important principles applicable in new era summary judgment practice. For example, complex cases and cases involving state of mind issues are not necessarily inappropriate for summary judgment. <u>Id</u>. at 1479. In addition, in responding to a summary judgment motion, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" <u>Id</u>. (quoting <u>Liberty Lobby</u>, 477 U.S. at 257). The nonmoving party must adduce more than a scintilla of evidence to overcome the summary judgment motion. <u>Id</u>. It is not sufficient for the nonmoving party to merely "'show that there is some metaphysical doubt as to the material facts.'"

2

Id. (quoting Matsushita, 475 U.S. at 586). Moreover, "[t]he trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." Id. That is, the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact.

II. History of the Case

Plaintiff was employed at Honda as production associate in the Repair Department at the Marysville Automobile Plant. Production associates build vehicles and vehicle components at Honda's manufacturing facilities. On November 21, 1999, plaintiff sustained severe head injuries and brain damage as a result of a fall at his home. Plaintiff underwent surgery and was comatose for a period of time. He was hospitalized for approximately two months. While hospitalized at the Ohio State University Hospitals ("OSU"), plaintiff was evaluated by the rehabilitation staff. According to his physician, Dr. Walter Mysiw, plaintiff was unable to follow directions or to solve problems, and had decreased attention and memory problems. Mysiw Dep., pp. 16-19. Plaintiff also had decreased functional strength, balance and coordination, and problems with being aware of his own deficits and limitations. Mysiw Dep., pp. 19-20. After his discharge, plaintiff continued to receive physical and occupational therapy, and was unable to live independently or work. Mysiw Dep., pp. 24-55. During this period, plaintiff was granted medical leave from his employment at Honda.

In the summer of 2000, plaintiff worked with Rodney Brandel, a counselor with the Bureau of Vocational Rehabilitation ("BVR"), a state agency within the Ohio Rehabilitation Service Commission,

to determine whether he could return to work at Honda.  Plaintiff underwent a neuropsychological evaluation performed by Dr. James Arnett, a psychologist at OSU.

In a report dated August 18, 2000, Dr. Arnett found that plaintiff had mild to moderate impairment.  See Honda's Motion for Summary Judgment, Ex. B.  He noted that: (1) plaintiff's attention and concentration functions, as analyzed in a controlled and distraction-free environment, appeared to be mildly impaired, and were adequate for activities involving low and moderate demands; (2) plaintiff's verbal and language abilities were average to below average, adequate for activities involving low to moderate demands; (3) plaintiff's problem solving abilities, including reasoning, speed, fine motor dexterity, and motor planning, were mildly impaired and adequate for activities involving low and moderate demands; (4) plaintiff's memory was average in regard to verbal information, and below average for non-verbal, visual information; and (5) plaintiff's psychomotor performance involving the use of hands in fine motor tasks and finger dexterity was moderately impaired and adequate for activities involving low to moderate demands for speed and dexterity.

Dr. Arnett concluded that plaintiff had mild to moderate impairment which raised questions about his safety in the performance of unplanned and high risk activities.  He recommended that plaintiff continue to receive psychological counseling, with practice of work-related skills, and that plaintiff be carefully evaluated prior to engaging independently in high risk activities. He stated that high risk activities included driving, climbing, working with appliances and power tools, and working with dangerous

4

tools and materials.  Dr. Arnett had observed manufacturing processes in automotive plants, but had never observed any of the job processes at Honda.  Arnett Aff., ¶ 7.

In August of 2000, plaintiff failed a driving evaluation at OSU and was instructed by Dr. Mysiw not to drive.  Mysiw Dep., p. 53.  The evaluation report stated that plaintiff showed deficits in divided attention, following directions, problem solving, depth perception, and orientation in space.  Kleiber Dep., Ex. E. Plaintiff also performed poorly during the on-the-road assessment. Dr. Mysiw also evaluated plaintiff's physical abilities.  Mysiw Dep., Ex. 12.  Plaintiff had some restrictions on lifting and carrying, but could lift or carry up to fifty pounds occasionally. Dr. Mysiw also noted that plaintiff could partially or frequently bend or stoop, squat, crawl or reach above shoulder level, and could occasionally balance, but that he could never climb or drive. In terms of hand movements, he was capable of simple grasping, pushing and pulling and fine manipulation.  Dr. Mysiw recommended a total restriction on driving or being on unprotected heights, and a moderate restriction on being around moving machinery.  He also noted that plaintiff would require supported employment, vocational rehabilitation and transportation.

The BVR obtained a work capacity form from Dr. Mysiw.  See Mysiw Dep., Ex. 8.  Dr. Mysiw indicated that physical limitations were not an issue, other than no unconstructed heights.  He noted that there were memory, attention and endurance issues, and that the cognitive issues required supervision and probably a job coach. However, the report did not indicate the extent of these cognitive problems, and also stated that it was unknown how long the

restrictions, such as working with supervision or a job coach, would be in place. Dr. Mysiw stated at his deposition that he did not know the features of Honda's work environment or job processes and that he could not say whether plaintiff would be capable of performing work at Honda. Mysiw Dep., pp. 48-49.

In the fall of 2000, the BVR contacted Honda to learn whether plaintiff would be able to return to some position at Honda. At that time, Honda had no vacant positions. Affidavit of Asst. Mgr. Randy Moore, ¶ 10. However, under its restriction management policy, Honda is normally willing to "bump" a non-restricted employee from a job in order to accommodate an associate with medical restrictions. Moore Aff., ¶ 4. At the time, Mr. Moore was Honda's company placement leader and a member of Honda's restriction management team. The team is comprised of experienced associates working full-time at attempting to accommodate associates with medical restrictions, as well as medical personnel and placement representatives from each of Honda's production departments. Moore Aff., ¶ 2. Members of the restriction management team have a broad knowledge of the departments and work areas, as well as a high level of expertise in placing employees into positions that meet medical restrictions. Moore Aff., ¶3. Mr. Moore was also a member of Honda's company placement review committee, which reviews the placement of employees with medical restrictions.

The BVR forwarded to Honda the work capacity form completed by Dr. Mysiw and general information about plaintiff's condition, including his limitations with respect to problem solving and short-term memory, that he needed to be shown how to do a job, not

just read instructions, that his fine dexterity was not good, that he would require a gradual return to work, that he could not drive, and that he would need a job coach for an unknown length of time. Moore Aff., ¶ 6 and Ex. A.

On October 27, 2000, Douglas Bigler, a member of Honda's restriction management team, Cathy Cronley, L.P.N., and Jean Jackson, R.N., met with Mr. Brandel and Joseph Roop, plaintiff's job coach. Bigler Aff., ¶ 6. Mr. Brandel provided additional information about plaintiff's cognitive limitations and stated that plaintiff had some physical impairment, including problems with walking and finger dexterity. Bigler Aff., ¶ 7. Everyone agreed that plaintiff was not capable of returning to the repair position which he occupied prior to his accident. Bigler Aff., ¶8; Brandel Dep., pp. 58-59. Mr. Brandel testified during his deposition that it was his understanding that the production work at Honda was complex, very fast-paced, and demanding, and that he did not know whether there were any jobs that plaintiff could have performed at Honda in November of 2000. Brandel Dep., pp. 39, 81-82, 123.

Mr. Bigler identified several positions he thought that plaintiff would be most likely to be able to perform given his medical issues, and Mr. Bigler and Ms. Cronley went to observe those processes to further analyze whether they would be appropriate for plaintiff. Bigler Aff., ¶¶ 11-12. However, upon observation, he and Ms. Cronley concurred that it did not appear that plaintiff would be able to perform the essential functions of those positions. Bigler Aff., ¶ 13.

For example, they considered the Right Rear Beam Tighten position in Assembly. This position required the employee to

7

examine the engine, identify and select the brackets needed to mount it, line up the engine mount, and fasten the engine to the car subframe using the proper torque.  The table on which this process is performed is in constant motion, requiring the employee to walk beside the table, and the process had to be completed in fifty-two seconds in a crowded area with an uneven surface.  Mr. Bigler concluded that this job was inappropriate for plaintiff due to his problems with finger dexterity and walking on uneven surfaces.  Bigler Aff., ¶ 14.

Mr. Bigler also considered the Front Bumper Install position in Assembly, which required the employee to examine a bumper arriving on a hydraulic lift to make sure it was the correct style, to line the bumper up and install it on the car with four bolts and a vibrating gun, and to retrieve a brake hose and position it into a flange on the car body, all within fifty-four seconds, while walking along the moving car over an uneven surface covered with mats and stepping over air hoses.  Mr. Bigler felt that this position would also pose problems for plaintiff due to his deficits with finger dexterity and walking over uneven surfaces.  Bigler Aff., ¶ 15.

Mr. Bigler also looked at the Carpet Load position.  That position required the employee to read specifications on a computer print-out to determine the type of carpet to be installed, to travel to another location to pick up the carpet, and to load it onto a carrier that would take the carpet to the installation area. Bigler Dep., pp. 30-31.  The employee was then required to read another computer print-out to determine the type of heater blower to be installed, and use a pair of pliers to manipulate a lever on

the heater blower before loading it onto the carrier with the carpet. Bigler Dep., p. 31. This process had to be performed in fifty-two seconds and required fine motor skills while using the pliers and extensive walking on and off safety mats and around carts and parts lying on the floor. Bigler Dep., p. 31.

Mr. Bigler felt that Honda needed more specific information about the extent of plaintiff's physical and cognitive limitations, and he referred the case to Mr. Moore and Ms. Jackson. Bigler Aff., ¶ 17. Honda requested that plaintiff be evaluated at Health Partners, Inc. Moore Aff., ¶ 7.

Plaintiff was evaluated by Sanford Goldstein, a physical therapist at Health Partners. Deposition Ex. BB. Mr. Goldstein noted that placement should avoid jobs that require fine motor and medium motor dexterity, or that require rapid cyclical work. He also noted that placement should consider plaintiff's inadequate balance, avoiding work processes requiring balance on uneven surfaces, such as mats, ladders, beam or scaffold walking, or crossing elevated surfaces. He recommended placement to a position involving simple lifting, carrying, pushing and pulling tasks in an area with level surfaces, minimal space restrictions, and high levels of worker control over the job processes. He noted that plaintiff's balance deficits "may" be successfully treated in physical therapy, and that numerous bouts of job coaching and subsequent supervision after placement would be needed to assure plaintiff's safety.

Dr. Robert Shadel, M.D., of Health Partners conducted a work ability evaluation. Dr. Shadel reviewed the evaluation of Dr. Mysiw conducted in August, and concluded that his evaluation was

9

similar to that of Dr. Shadel.  Dr. Shadel also considered Mr. Goldstein's evaluation in writing his report.  In a letter dated November 13, 2000, Deposition Ex. AA, Dr. Shadel reported that plaintiff had persistent brain function impairment, including: (1) both verbal and nonverbal memory deficit; (2) a significantly limited ability to lift and carry objects; (3) a moderate deficit of fine motor and dexterity of hands, significantly limiting his ability to work processes which require rapid work or moderate dexterity; (4) compromised problem solving ability; and (5) compromised coordination, particularly with quick movements.

Dr. Shadel determined that plaintiff scored outside the normal range for sustained attention and demonstrated deficits with his short-term and semantic memory.  Shadel Aff., ¶2.  For example, Dr. Shadel had to say the three words "tulip, umbrella and fear" three times before plaintiff could repeat them back, demonstrating a significant memory deficit.  Shadel Aff., ¶ 3.  He also observed that plaintiff demonstrated deficits in fine motor coordination and problems walking and maintaining balance.  Shadel Dep., pp. 38-39, 44.  During the examination, plaintiff was unable to walk in a straight line by placing the heel of one foot in front of the toe of his other foot, and could not stand on one leg for more than two seconds.  Shadel Dep., pp. 55-56.

Dr Shadel concluded that plaintiff could not work independently, and that he would require intensive coaching initially and ongoing to handle activities of low to moderate demands.  Ex. AA.  He further recommended that plaintiff work in level areas where balance was not an issue, with no mats, stairs, uneven surfaces, quick side-to-side or pivoting movements, or

10

stepping over obstructions such as hoses or lines.  Dr. Shadel also noted that plaintiff's hand ability allowed only light gripping and processes requiring only simple, slow hand and finger movements. Since plaintiff's memory deficits would require repetition of instructions, verbally and non-verbally, Dr. Shadel recommended that plaintiff not be placed in an area with multiple processes. Dr. Shadel noted that plaintiff would probably require a gradual return to work, and that even with the above limitations, it could not be predicted how plaintiff would function in a busy and distracting environment.

Dr. Shadel also reviewed Dr. Arnett's August 17, 2000, evaluation of plaintiff, and found Dr. Arnett's report to be consistent with his screening and with the evaluation performed by Mr. Goldstein.  Shadel Aff., ¶ 4.  He noted that these evaluations reflected that there was no reason to expect significant improvement in plaintiff's condition in the future.  Shadel Aff., ¶ 4.  Dr. Shadel felt that the production line jobs at Honda require more than low to moderate demands and that they require rapid work because of the time pressure inherent in the production line.  Shadel Aff., ¶ 5.  He left the final placement decision to Honda's restriction management team because of the team's expertise regarding Honda's job processes.  Shadel Aff., ¶ 6.

Dr. Mysiw, plaintiff's treating physician, testified at his deposition that he did not disagree with any of Dr. Shadel's findings and conclusions, or with any of the conclusions or recommendations in Mr. Goldstein's and Dr. Arnett's reports.  Mysiw Dep., pp. 37-38, 51-52.

The company placement review committee, including Mr. Moore,

11

Ms. Jackson, and an assistant manager in disability case management, reviewed Dr. Shadel's findings and conclusions, and considered whether there were any production positions plaintiff could perform with or without reasonable accommodation. Moore Aff., ¶¶ 8, 10. On November 16, 2000, the committee determined that plaintiff could not perform the essential functions of any production position at Honda, with or without reasonable accommodation. Moore Aff., ¶ 11.

The committee believed that the ongoing use of a job coach was not a reasonable accommodation because one of the essential functions of a production job was that the associate be able to work independently, and if a job coach was required, the coach, not the employee, would be performing some of the essential functions of the job. Moore Aff., ¶12. The committee also concluded that even with a job coach, plaintiff had problem-solving, memory and physical deficits that enabled him to perform only jobs with low to moderate demands, not rapid work or jobs with multiple tasks. Mr. Moore indicated that all production positions at Honda entail more than low to moderate demands, including the requirement that the employee rapidly perform multiple steps in less than one minute while moving alongside a vehicle traveling down the production line. Moore Aff., ¶13. Mr. Moore also stated that production jobs involved significant decision making, including reading and analyzing a specification sheet while working on multiple models and styles of vehicles and determining from the specification sheet which parts or process steps were required. In addition, production employees have to be able to recognize, analyze, and make appropriate decisions regarding quality issues. Moore Aff.,

12

¶ 14. Production employees must have the decision-making capacity to deal with safety issues that may arise during production, and the committee had concerns that plaintiff's limitations would pose an unacceptable safety risk to himself or others. Moore Aff., ¶15. The committee also noted that plaintiff was prevented from working in a substantial number of areas at Honda due to his gait problems which restricted him from working in areas where balance would be a problem, including areas with mats, stairs, uneven surfaces, or obstructions such as hoses or lines. Moore Aff., ¶ 16. Mr. Moore also noted that plaintiff was previously restricted from working in the Weld Department due to the fact that certain fumes triggered seizure activity. Moore Aff., ¶ 19. Because the committee determined that there were no production processes that plaintiff could perform with or without reasonable accommodation, plaintiff was not permitted to return to work. Moore Aff., ¶ 20.

In the fall of 2000, Honda's associate service policy, which was included in Honda's associate handbook, included the following provision:

> The following will result in your separation from employment and will end service when you:...[a]re not actively employed by HAM for any reason for twelve (12) consecutive months unless on approved leave of absence due to an occupational injury or illness, serving in the armed forces, on an educational leave, or laid off.

According to Yolanda Terry, an employee in Associate Relations charged with administering Honda's associate service policy, this policy is consistently and uniformly applied to all associates, whether disabled or non-disabled. Terry Aff., ¶ 5. In the course of her duties, she became aware that as of November 22, 2000, plaintiff had been on medical leave for a non-occupational injury

and was not actively employed for twelve consecutive months.  Terry Aff., ¶ 6.  Plaintiff's employment was terminated pursuant to the associate service policy.  Terry Aff., ¶ 7.

III. Disability Discrimination Claims

A. Plaintiff's Discrimination Claims

Plaintiff has asserted claims of disability discrimination under the ADA and Ohio law, including a claim of failure to accommodate his disability and discrimination in his termination due to his disability.

Under the ADA, it is unlawful to discriminate against a qualified individual in the terms and conditions of employment based on that individual's disability.  See 42 U.S.C. §12112(a).  An employer violates the ADA if it fails to "mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity."  42 U.S.C. §12112(b)(5)(A).

To prevail on his failure to accommodate claim, plaintiff must show: (1) that he has a disability; (2) that he was qualified for the job; and (3) that he was denied a reasonable accommodation for his disability.  Roush v. Weastec, Inc., 96 F.3d 840, 843 (6th Cir. 1996).  The employee must establish that a reasonable accommodation is possible, and that he is qualified for the position with such reasonable accommodation.  Hoskins v. Oakland County Sheriff's Dep't, 227 F.3d 719, 728 (6th Cir. 2000).  An employer is not required to make an accommodation if it fulfills its burden of

14

proving that such reasonable accommodation would impose an undue hardship. Id.; 42 U.S.C. §12112(b)(5)(A).

A "qualified individual with a disability" is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. §12111(8).

In order to make out a prima facie case of discrimination in the termination of employment, plaintiff must show that:(1) he is an individual with a disability; (2) he is "otherwise qualified" to perform the job requirements, with or without reasonable accommodation; and (3) he was discharged solely by reason of his handicap. Brickers v. Cleveland Bd. of Educ., 145 F.3d 846, 849 (6th Cir. 1998); Monette v. Electronic Data Sys. Corp., 90 F.3d 1173, 1178 (6th Cir. 1996).

Ohio Rev. Code §4112.02(A) prohibits employers from discharging without just cause or otherwise discriminating against employees because of a handicap. In order to establish a prima facie case under §4112.02(A), plaintiff must show: (1) that he was handicapped; (2) that an adverse employment action was taken by the employer, at least in part, because the plaintiff was handicapped; and (3) that the plaintiff, although handicapped, can safely and substantially perform the essential functions of the job in question. Columbus Civil Serv. Comm'n v. McGlone, 82 Ohio St.3d 569, 697 N.E.2d 204 (1998). Under Ohio law, an employer must also make reasonable accommodation to the disability of an employee or applicant, unless the employer can demonstrate that such an accommodation would impose an undue hardship on the conduct of the employer's business. Smith v. Dillard Department Stores, Inc., 139

15

Ohio App.3d 525, 532, 744 N.E.2d 1198 (2000); Ohio Admin. Code §4112-5-08(E)(1).

The Ohio Supreme Court has noted that the Ohio handicap discrimination law is similar to the ADA, and has looked to federal law in applying the Ohio statute. See McGlone, 697 N.E.2d at 206-7. Thus, it is appropriate to apply ADA standards and authorities in analyzing claims under §4112.02(A). See Brenneman v. MedCentral Health System, 366 F.3d 412, 418 (6th Cir. 2004); Plant v. Morton International, Inc., 212 F.3d 929, 938-39 (6th Cir. 2000).

In this case, the parties do not dispute the fact that plaintiff is disabled within the meaning of the ADA. The parties also do not dispute that plaintiff is no longer capable of performing his prior job in the Repair Department. However, the parties disagree as to whether plaintiff is qualified to perform the essential functions of any production associate position at Honda. The parties also disagree as to whether Honda acted in good faith in denying plaintiff another position. The parties also dispute whether plaintiff's employment was terminated for a nondiscriminatory reason.

B. Failure to Accommodate

1. Transfer to a Vacant Position

Plaintiff alleges that Honda failed to accommodate his disability by transferring him to another production job at Honda. A reasonable accommodation may include "reassignment to a vacant position[.]" 42 U.S.C. §12111(9)(B). See also Smith, 139 Ohio App.3d 525 at 532; Wooten v. Columbus, Div. of Water, 91 Ohio App.3d 326, 334, 632 N.E.2d 605, 610 (1993)(reasonable accommodation may include transfer, reassignment or hire into a

16

vacant position the handicapped employee can perform both physically and by qualification). An employer may also be required to reassign an individual to a position that is currently unavailable but will become vacant in a short period of time. Monette, 90 F.3d at 1187. Plaintiff bears the burden of showing that a vacant position exists and that the plaintiff is qualified for that position. McCreary v. Libbey-Owens-Ford Co., 132 F.3d 1159, 1165 (7th Cir. 1997).

An employer is not obligated to create a position not then in existence for the disabled employee. Hoskins, 227 F.3d at 729; DeBolt v. Eastman Kodak Co., 146 Ohio App.3d 474, 494, 766 N.E.2d 1040 (2001)(an employer is not required to create a position or make work for a handicapped employee). An employer need only reassign a disabled employee to a vacant position. Burns v. Coca-Cola Enterprises, Inc., 222 F.3d 247, 257 (6th Cir. 2000). Where there is no vacant position for which the employee is qualified at the time of termination, there is no discrimination. Cassidy v. Detroit Edison Co., 138 F.3d 629, 634 (6th Cir. 1998)(under §12111(9)(B), an employer need only reassign the employee to a vacant position); Smith v. Ameritech, 129 F.3d 857, 867 (6th Cir. 1997)(the ADA does not require an employer to reassign an employee to a position that is not vacant); Scott v. University of Toledo, 137 Ohio App.3d 538, 544, 739 N.E.2d 351 (2000)(the law does not require the employer to place the employee on an indefinite leave of absence during which a position for which the employee might be qualified might become available).

Likewise, an employer has no duty to displace or "bump" another employee from a position to accommodate the request of a

17

disabled employee. <u>Burns</u>, 222 F.3d at 257; <u>Cravens v. Blue Cross and Blue Shield of Kansas City</u>, 214 F.3d 1011, 1019 (8th Cir. 2000); <u>Dalton v. Subaru-Isuzu Automotive, Inc.</u>, 141 F.3d 667, 678 (7th Cir. 1998); <u>McCreary</u>, 132 F.3d at 1165.

Honda has offered uncontroverted evidence that there were no vacant production associate positions in the fall of 2000, when plaintiff sought to return to Honda. Thus, Honda did not violate the ADA in failing to accommodate plaintiff by placing him in another position. Honda does have a policy under which disabled employees are permitted to "bump" other nondisabled employees who hold positions which can be performed by the disabled employee with reasonable accommodation. However, the fact that Honda has a policy which goes beyond the requirements of the ADA does not mean that it was required to create a vacancy in plaintiff's case. As the Eleventh Circuit noted in <u>Lucas v. W.W. Grainger, Inc.</u>, 257 F.3d 1249, 1257 n. 3 (11th Cir. 2001), "Good deeds ought not be punished, and an employer who goes beyond the demands of the law to help a disabled employee incurs no legal obligation to continue doing so."

The Sixth Circuit has stated that an "employer who provides an accommodation that is not required by the ADA to one employee is not consequentially obligated to provide the same accommodation to other disabled employees." <u>Smith</u>, 129 F.3d at 867. The court noted that "if the ADA required employers to offer all disabled employees an accommodation that it provided 'to some employees as a matter of good faith,' then 'a good deed would effectively ratchet up liability.'" <u>Id</u>. at 868 (quoting <u>Myers v. Hose</u>, 50 F.3d 278, 284 (4th Cir. 1995)). The court further opined that this would

deter employers from providing greater accommodations than are required by law, and that "'[d]iscouraging discretionary accommodations would undermine Congress' stated purpose of eradicating discrimination against disabled persons.'" <u>Id</u>. (quoting <u>Myers</u>, 50 F.3d at 284). The court held that the employers' provision of a certain accommodation to one disabled employee did not automatically entitle the plaintiff to the same accommodation. <u>Id</u>.

Since there were no vacancies at the time plaintiff sought another position, Honda did not violate the ADA's accommodation requirements by failing to place plaintiff in another job.

<u>2. Job Coach as Reasonable Accommodation</u>

Plaintiff contends that he could have performed other positions at Honda with the assistance of a job coach. Plaintiff bears the initial burden of establishing that this accommodation is reasonable. <u>Walsh v. United Parcel Service</u>, 201 F.3d 718, 725 (6th Cir. 2000). Honda argues that a job coach would not have been a reasonable accommodation in this case because there is no evidence that plaintiff would only have required the job coach on a temporary basis. Dr. Mysiw indicated on the work capacity form that he did not know how long the restriction of supervision, including a job coach, would be in place. Although the use of a temporary job coach to assist in the training of a qualified disabled individual can be a reasonable accommodation, a full-time job coach providing more than training is not a reasonable accommodation. <u>Equal Employment Opportunity Comm'n v. Dollar General Corp.</u>, 252 F.Supp.2d 277, 291-92 (M.D.N.C. 2003)(for job coach to be reasonable accommodation, plaintiff had to show that

plaintiff performed essential functions of job independently with verbal prompting or a bare minimum of physical prompting needed to demonstrate proper technique; job coach must not be called upon to perform essential functions of job held by disabled employee); 29 C.F.R. pt. 1630, App. at §1630.9.

Honda was not required under the ADA to provide a permanent job coach to supervise plaintiff's activities. See Equal Employment Opportunity Comm'n v. Hertz Corp., No. 96-72421 (unreported), 1998 WL 5694 (E.D.Mich. 1998)(employer had no duty under ADA to provide job coach); Ricks v. Zerox Corp., 877 F.Supp. 1468 (D.Kan. 1995)(employee's request for a full-time helper unreasonable as a matter of law).  In addition, the Honda company placement review committee believed that the ongoing use of a job coach was not a reasonable accommodation because one of the essential functions of a production job was that the associate be able to work independently, and if a job coach was required, the coach, not the employee, would be performing some of the essential functions of the job. Moore Aff., ¶12.  Employers are not required to hire new employees or helpers to perform essential functions or duties of a disabled employee's job which the employee cannot perform by virtue of his disability. Peters v. City of Mauston, 311 F.3d 835, 845 (7th Cir. 2002); Bratten v. SSI Services, Inc., 185 F.3d 625, 632 (6th Cir. 1999).

Plaintiff has not produced evidence which raises a genuine issue of fact as to whether the use of a job coach was a reasonable accommodation in his case.

3. Was Plaintiff Otherwise Qualified?

Plaintiff also contends that there were positions at Honda for

20

which he would have been qualified.  Honda argues that, even assuming it was required under the ADA to displace another employee to accommodate the plaintiff, the evidence is insufficient to show that plaintiff was qualified to perform any position at Honda, with or without reasonable accommodation, and that there is no evidence sufficient to create a genuine issue of fact on that point.

The duty to reassign does not extend to every job in a company.  "Nothing in the ADA requires an employer to abandon its legitimate, nondiscriminatory company policies defining job qualifications, prerequisites, and entitlements to intra-company transfers." Dalton, 141 F.3d at 678.  Further, an employee has the burden of identifying particular positions to which he could be reassigned based on his qualifications. Burns, 222 F.3d at 259. Plaintiff must show that he requested, and was denied, reassignment to a position for which he was otherwise qualified. Id. at 258 ("[A]lthough employers have a duty to locate suitable positions for disabled employees, such employees may not recover unless they propose, or apply for, particular alternative positions for which they are qualified.") It is not sufficient for the employee to simply identify positions in his pleadings as potential accommodations. Id.

There is no evidence that plaintiff requested to be considered for a particular position at the time he sought to return to work at Honda.  When asked at his deposition to identify what positions he felt he was capable of performing, plaintiff noted the subassembly of fuel canisters, brakes and clutches. However, Honda has produced evidence that these positions were eliminated in the mid- to late 1990's and were not available in 2000 when plaintiff

21

was seeking placement.  Bigler Aff., ¶ 18.

Plaintiff also mentioned processes involving the installation of grommets.  Mr. Bigler stated that there were various processes involving the installation of grommets at the time, but all of those processes required performing multiple steps within a short period of time, fine motor skills, and attention to quality and safety issues.  Bigler Aff., ¶ 18.  There is evidence that plaintiff had mental and physical deficits, including impaired decision making, inability to perform work that involved more than low to moderate demands, and inability to perform work with multiple tasks, which rendered him unqualified to perform these processes.  For example, Dr. Shadel reported that plaintiff had persistent brain function impairment, including: (1) both verbal and nonverbal memory deficit; (2) a significantly limited ability to lift and carry objects; (3) a moderate deficit of fine motor and dexterity of hands, significantly limiting his ability to work processes which require rapid work or moderate dexterity; (4) compromised problem solving ability; and (5) compromised coordination, particularly with quick movements.  Mr. Goldstein noted that placement should avoid jobs that require fine motor and medium motor dexterity, or that require rapid cyclical work.

Plaintiff also testified that there might be positions in the Paint Department which he could perform.  He refers in his memorandum contra to a process called "exterior wipe-off," and claims he could perform this job because he was capable of gripping a towel and using it to wipe a car.  However, Honda notes evidence that the exterior wipe-off process involves fine motor skills to avoid dragging the cloth through the sealer on the vehicle, that

22

the process is performed in an area with uneven surfaces, and that it requires the employee to work rapidly at the production line pace while stepping over obstructions and while paying attention to quality and safety issues. Moore Dep., pp. 108-09; Bigler Aff., ¶¶ 19-20.

There is also evidence that most processes in the Paint Department are located in areas with uneven surfaces, including gratings and raised platforms, and employees are required to step over eighteen-inch high conveyor lines on the floor and walk alongside moving vehicles while stepping over obstructions. Bigler Aff., ¶ 19; Moore Aff., ¶ 17. Both Mr. Goldstein and Dr. Shadel noted that plaintiff had balance deficits and should avoid working in areas with uneven surfaces. Although Mr. Goldstein indicated that plaintiff's balance problems "may" be improved with physical therapy, Dr. Shadel noted that there was no reason to expect significant improvement in plaintiff's condition in the future. Shadel Aff., ¶ 4. Reasonable accommodation does not require an employer to wait indefinitely for an employee's medical condition to be corrected. Gantt v. Wilson Sporting Goods Co., 143 F.3d 1042, 1047 (6th Cir. 1998).

The Paint Department processes also require employees to perform multiple steps under deadline pressures while being mindful of quality and safety issues, and many require fine motor skills. Bigler Aff., ¶¶ 19-20; Moore Aff., ¶¶ 17-18. In his report, Dr. Shadel noted that plaintiff's hand ability allows only light gripping, and that he is capable only of processes requiring simple, slow hand and finger movements. Dr. Shadel also recommended that plaintiff not be placed in an area with multiple

processes, since plaintiff's memory deficits would require repetition of instructions, verbally and non-verbally.

Plaintiff claims that Honda incorrectly interpreted Dr. Shadel's reference to stairs as a restriction to mean that plaintiff could not climb stairs once a day to a second-floor job. However, Dr. Shadel's restrictions also included that plaintiff should not work on surfaces with mats, uneven surfaces or surfaces with obstructions. The evidence shows that the processes considered by Honda were performed in areas with uneven surfaces, grates, raised platforms and raised conveyor lines or other obstructions. Even assuming that Honda misinterpreted Dr. Shadel's reference to stairs, there were other obstacles to plaintiff's employment in these areas.

Plaintiff asserts that Jim Stoshak, his physical therapist, performed tests that showed that plaintiff's balance issues were not as significant as those found by Dr. Shadel. However, Mr. Stoshak was asked during his deposition to review Dr. Shadel's assessments, and stated that he had no reason to believe that anything contained in Dr. Shadel's report was incorrect. Stoshak Dep., pp. 79-80.

Plaintiff also claims that Melissa Latshaw, his occupational therapist, disagreed with many of Dr. Shadel's conclusions. Ms. Latshaw testified that plaintiff would have been able to perform jobs involving simple assembly. Latshaw Dep., pp. 96, 114. However, she offered no evidence that plaintiff was capable of performing any particular job at Honda. There is ample evidence that the production positions at Honda involve more than simple assembly, and that they require the rapid completion of multiple

24

tasks.  Although plaintiff claims that Ms. Latshaw offered the opinion that plaintiff could return to work at Honda, there is no evidence that she had any personal knowledge of the essential functions of production positions at Honda.  Thus, this opinion is insufficient to raise a genuine issue of fact.  See Bratten, 185 F.3d at 635 (expert's opinion that employee could perform physical tasks required by other jobs did not preclude summary judgment where expert failed to articulate the basis of his opinion).

Ms. Latshaw also did not disagree with the fact that plaintiff had cognitive deficits which precluded him from performing a job with multiple processes, and which required an ongoing job coach for activities of low to moderate demands.  Latshaw Dep., pp. 105-07.  She also could not say that Mr. Goldstein's report did not accurately reflect how plaintiff performed during that evaluation. Latshaw Dep., p. 103.  Plaintiff's claim that there are discrepancies between the assessments of Mr. Stoshak and Ms. Latshaw and the evaluation completed by Mr. Goldstein and Dr. Shadel at Health Partners is further undermined by the fact that Dr. Mysiw, plaintiff's treating physician, testified at his deposition that he did not disagree with any of Dr. Shadel's findings and conclusions, or with any of the conclusions or recommendations in Mr. Goldstein's and Dr. Arnett's reports.  Mysiw Dep., pp. 37-38, 51-52.

Plaintiff also notes the opinion of Dr. Arnett that plaintiff would be capable of performing "routine, repetitive employment in a factory setting."  However, Dr. Arnett was not familiar with any of the essential functions of any Job process at Honda, and never offered an opinion as to whether plaintiff could perform any job

there.  Arnett Aff., ¶¶ 7-8.  Further, the evidence submitted by Honda indicates that the job processes at Honda consisted of more than routine, repetitive employment.  Even Mr. Brandel, plaintiff's BVR representative, admitted that the production work at Honda is complex, "very fast-paced" and "very demanding."  Brandel Dep. at 39, 123.

Plaintiff's own personal observations and conclusory opinions that he could perform work at Honda are not enough to withstand summary judgment in the face of evidence to the contrary.  Boback v. General Motors Corp., 107 F.3d 870 (table), 1997 WL 3613 at *4 (6th Cir. 1997)(citing White v. York Int'l Corp., 45 F.3d 357, 362-63 (10th Cir. 1995)).  See also Smith v. Honda of America Mfg. Inc., 101 Fed.Appx. 20, 26 (6th Cir. 2004)(summary judgment properly granted to employer who attempted to provide reasonable accommodation where employee's request to transfer was too vague to identify a specific position to which she could have been transferred and employee's claim was supported only by her bare, inexpert assertion).  Plaintiff has failed to produce evidence sufficient to raise a genuine issue of fact on the question of whether he is qualified to perform any of the production jobs at Honda with or without reasonable accommodation.

4. Interactive Process

Plaintiff argues that regardless of whether he has produced sufficient evidence to make out a prima facie case of failure to accommodate, Honda is liable under the ADA for failing to participate in the interactive process.  The ADA regulations state that to determine the appropriate reasonable accommodation, the employer may need to "initiate an informal, interactive process

26

with the [employee] in need of the accommodation.  This process should identify the precise limitations resulting from the disability and the potential reasonable accommodations that could overcome those limitations." 29 C.F.R. §1630.2(*o*)(3).  An employer must make a "reasonable effort" to determine the appropriate reasonable accommodation, which "is best determined through a flexible, interactive process that involves both the employer and the [employee] with a disability."  29 C.F.R. Pt. 1630, App. §1630.9 at 359.

The employee must provide enough information about his or her limitations and desires so as to suggest at least the possibility that reasonable accommodation may be found in a reassignment job within the company.  <u>Smith v. Midland Brake, Inc.</u>, 180 F.3d 1154, 1172 (10th Cir. 1999).  Once the employer's responsibilities within the interactive process are triggered by appropriate notice by the employee, both parties have an obligation to proceed in a reasonably interactive manner to determine whether the employee would be qualified, with or without reasonable accommodations, for another job within the company, and, if so, to identify an appropriate reassignment opportunity if any is reasonably available.  <u>Id</u>.

The interactive process does not dictate that any particular concession must be made by the employer; all the interactive process requires is that employers make a good-faith effort to seek accommodations.  <u>Taylor v. Phoenixville School Dist.</u>, 184 F.3d 296, 317 (3d Cir. 1999).  Employers can show their good faith by taking steps such as meeting with the employee who requests an accommodation, requesting information about the condition and the

employee's limitations, asking the employee what he wants, showing some sign of having considered the employee's request, and offering to discuss available alternatives when the employee's request is too burdensome.  <u>Id</u>.

Before considering whether there has been a failure to engage in the interactive process, this court must first determine whether there is a genuine issue of material fact regarding the availability of a vacant position to accommodate the plaintiff. <u>Ozlowski v. Henderson</u>, 237 F.3d 837, 840 (7th Cir. 2001); <u>Jackan v. New York State Dep't of Labor</u>, 205 F.3d 562, 567 (2d Cir. 2000). It is plaintiff's burden to show that a vacant position existed, and only when he meets that burden does the issue arise as to whether the failure to provide accommodation was due to a breakdown in the interactive process.  <u>Ozlowski</u>, 237 F.3d at 840 (where plaintiff provided no evidence of his qualifications for the positions he identified or any evidence that such positions were vacant, other than his own conclusory statements, summary judgment was appropriate).  <u>See</u> <u>also</u> <u>Jackan</u>, 205 F.3d at 567 n. 4 (noting that it was not unfair to require plaintiff to prove the existence of a vacancy since plaintiff can utilize discovery procedures to identify vacancies that existed at the pertinent time).  Here, it is undisputed that there were no vacant positions at the time plaintiff sought accommodation.

Honda further argues that it is entitled to summary judgment on this issue because the evidence shows that Honda engaged in the interactive process in good faith and there is no genuine issue in that regard.  The record reveals that on October 27, 2000, Douglas Bigler, a member of Honda's restriction management team, Cathy

Cronley, L.P.N., and Jean Jackson, R.N., met with Mr. Brandel of the BVR and Joseph Roop, plaintiff's job coach. Bigler Aff., ¶ 6. Honda's restriction management team included experienced associates working full-time at attempting to accommodate associates with medical restrictions, as well as medical personnel and placement representatives from each of Honda's production departments. Moore Aff., ¶ 2. Members of the restriction management team have a broad knowledge of the departments and work areas, as well as a high level of expertise in placing employees into positions that meet medical restrictions. Moore Aff., ¶3. As noted previously, Honda went beyond the requirements of the ADA by considering whether plaintiff's disabilities could be accommodated even though there were no vacant positions.

Honda received the work capacity form completed by Dr. Mysiw and general information about plaintiff's condition, including his limitations with respect to problem solving and short-term memory, that he needed to be shown how to do a job, not just read instructions, that his fine dexterity was not good, that he would require a gradual return to work, that he could not drive, and that he would need a job coach for an unknown length of time. Moore Aff., ¶ 6 and Ex. A. Mr. Brandel also provided additional information about plaintiff's cognitive limitations and stated that plaintiff had some physical impairment, including problems with walking and finger dexterity. Bigler Aff., ¶ 7.

Mr. Bigler identified several positions he thought that plaintiff would be most likely to be able to perform given his medical issues, and Mr. Bigler and Ms. Cronley went to observe six processes to further analyze whether they would be appropriate for

plaintiff. Bigler Aff., ¶¶ 11-12; Bigler Dep., pp. 29, 40. These processes included the Right Rear Beam Tighten and the Front Bumper Install positions in Assembly and a Carpet Load position. However, he and Ms. Cronley concurred that it did not appear that plaintiff would be able to perform the essential functions of those positions. Bigler Aff., ¶ 13.

Mr. Bigler felt that Honda needed more specific information about the extent of plaintiff's physical and cognitive limitations, and he referred the case to Mr. Moore and Ms. Jackson. Bigler Aff., ¶ 17. Honda requested that plaintiff by evaluated at Health Partners, Inc. Moore Aff., ¶ 7. The company placement review committee, including Mr. Moore, Ms. Jackson, and an assistant manager in disability case management, reviewed Dr. Shadel's findings and conclusions, and considered whether there were any production positions plaintiff could perform with or without reasonable accommodation. Moore Aff., ¶¶ 8, 10.

On November 16, 2000, the committee determined that plaintiff could not perform the essential functions of any production position at Honda, with or without reasonable accommodation. Moore Aff., ¶ 11. The committee also considered whether the use of a job coach would be a reasonable accommodation, and concluded that it would not be because one of the essential functions of a production job was that the associate be able to work independently, and if a job coach was required, the coach, not the employee, would be performing some of the essential functions of the job. Moore Aff., ¶12.

The committee also concluded that even with a job coach, plaintiff had problem-solving, memory and physical deficits that

30

enabled him to perform only jobs with low to moderate demands, not rapid work or jobs with multiple tasks. Mr. Moore indicated that all production positions at Honda entail more than low to moderate demands, including the requirement that the employee rapidly perform multiple steps in less than one minute while moving alongside a vehicle traveling down the production line. Moore Aff., ¶13. Mr. Moore also stated that production jobs involved significant decision making, including reading and analyzing a specification sheet while working on multiple models and styles of vehicles and determining from the specification sheet which parts or process steps were required. In addition, production employees have to be able to recognize, analyze, and make appropriate decisions regarding quality issues. Moore Aff., ¶ 14. Production employees must have the decision-making capacity to deal with safety issues that may arise during production, and the committee had concerns that plaintiff's limitations would pose an unacceptable safety risk to himself or others. Moore Aff., ¶15. The committee also noted that plaintiff's gait problems which restricted him from working in areas where balance would be a problem, such as areas with mats, stairs, uneven surfaces, or obstructions such as hoses or lines, also prevented him from working in a substantial number of areas at Honda. Moore Aff., ¶ 16.

This evidence indicates that Honda engaged in the interactive process by meeting with the BVR personnel assisting plaintiff, by obtaining information concerning plaintiff's condition, by utilizing trained employees to identify and investigate possible positions for plaintiff, and by carefully considering and weighing

the requirements of those positions against plaintiff's limitations. The committee also arranged for plaintiff to be evaluated by a doctor and a physical therapist when more information concerning plaintiff's condition was needed.

Plaintiff contends that Honda should have requested additional information concerning his condition from his physicians and therapists. However, as noted above, "the responsibility for the interactive process is shared." Loulseged v. Akzo Nobel Inc., 178 F.3d 731, 736 (5th Cir. 1999). An employer cannot be found to have violated the ADA when responsibility for the breakdown in the informal interactive process is traceable to the employee and not the employer. Id. For example, in Beck v. University of Wisconsin Bd. of Regents, 75 F.3d 1130, 1137 (7th Cir. 1996), the court noted that where the employee failed to provide medical information necessary to the understanding of her condition, it was "the employee who appears not to have made reasonable efforts."

Here, plaintiff was in the best position to know about his own medical treatment. He was placed on notice through Honda's request for a medical evaluation by Health Partners that more information was needed, yet there is no evidence that plaintiff ever provided additional information from Dr. Mysiw, or that he ever provided the names of Jim Stoshak, his physical therapist, or Melissa Latshaw, his occupational therapist, as being possible sources of additional information. Honda cannot be faulted for failing to seek them out. There is no evidence that Honda was ever given information from Mr. Stoshak or Ms. Latshaw before or during the interactive process. Honda did have the work evaluation form completed by Dr. Mysiw, plaintiff's treating physician, and Dr. Mysiw indicated in his

deposition that he agreed with the assessment of Dr. Shadel and Mr. Goldstein.   Therefore, even if Honda had requested additional information from Dr. Mysiw, there is no evidence to suggest that any additional information from Dr. Mysiw would have altered Honda's analysis of plaintiff's disabilities.

Plaintiff also suggests that Honda should have permitted his job coach to tour Honda's manufacturing facilities to determine if there was a position which plaintiff could perform.   There is no evidence that plaintiff ever requested to view any particular job process at the time he was seeking a job.   Further, plaintiff's job coach, Mr. Roop, indicated that it was not his practice to initially identify the jobs that a disabled employee may be able to perform.   Rather, he relies on  the employer to identify possible job placements, and it is his job to match the employee's abilities, limitations and possible accommodations needed for the job identified by the employer and make recommendations.   Roop Aff., ¶¶ 4-6.

The evidence shows that Honda engaged in the interactive process in good faith, and no genuine issue of fact has been shown to exist in that regard.

Honda argues that even if there is a genuine issue as to whether it engaged in good faith in the interactive process, that failure alone is not sufficient for liability.   Honda contends that in order to establish liability based on a failure to accommodate due to the employer's bad faith in the interactive process, plaintiff must also show that he would have been able to perform an available job with accommodations.   Honda argues that plaintiff has not met this burden.   Plaintiff argues that Honda may be liable

solely for failing to engage in the interactive process in good faith, and that he is not required to show that he was qualified for a position at Honda or that reasonable accommodation was available in order to obtain injunctive relief directing Honda to engage in the interactive process.

The weight of authority supports Honda's position. <u>See</u>, <u>e.g.</u>, <u>Frazier v. Simmons</u>, 254 F.3d 1247, 1263 (10th Cir. 2001)(even assuming a breakdown in interactive process, plaintiff must show that a reasonable accommodation was possible and would have led to a reassignment position he was qualified to perform); <u>Donahue v. Consolidated Rail Corp.</u>, 224 F.3d 226, 234 (3d Cir. 2000)(where record is insufficient to establish the existence of an appropriate position into which plaintiff could have been transferred, employer is entitled to summary judgment even if employer failed to engage in good faith in the interactive process); <u>Jackan</u>, 205 F.3d at 567 (plaintiff bears both the burden of production and of persuasion on question of whether a suitable vacancy existed at the time he sought transfer); <u>Cannice v. Norwest Bank Iowa N.A.</u>, 189 F.3d 723, 727-28 (8th Cir. 1999)(there is no per se liability under the ADA for failing to engage in interactive process; plaintiff must still show that an accommodation of his disability would have allowed him to keep his job); <u>Taylor</u>, 184 F.3d at 317-18 (must show that accommodation was possible); <u>Midland Brake</u>, 180 F.3d at 1174 (even if employer failed to fulfill its interactive obligations, plaintiff not entitled to recovery unless he can also show that a reasonable accommodation was possible and would have led to a reassignment position); <u>Willis v. Conopco, Inc.</u>, 108 F.3d 282, 285 (11th Cir. 1997)("The ADA ... is not intended to punish employers

34

for behaving callously if, in fact, no accommodation for the employee's disability could reasonably have been made.") The Sixth Circuit cited Taylor with approval in Breitfelder v. Leis, 151 Fed.Appx. 379, 2005 WL 2470996 *7 (6th Cir. 2005) and held that plaintiff's claim of failure to participate in the interactive process failed because he did not prove that his disability could have been reasonably accommodated but for the employer's lack of good faith.

As previously discussed, plaintiff has failed to identify a position at Honda for which he would have been qualified with or without reasonable accommodations, and no genuine issue of material fact has been shown to exist in that regard. Plaintiff's claim based on failure to engage in good faith in the interactive process cannot stand.

5. Conclusion

Plaintiff has failed to produce evidence sufficient to sustain his burden of establishing a prima facie case of discrimination based on a failure to accommodate, and no genuine issue of material fact has been raised as to this claim. Honda is entitled to summary judgment on the failure to accommodate claim.

C. Termination

As previously noted, in order to make out a prima facie case of discrimination in termination, the plaintiff must show that he was "otherwise qualified" to perform the essential requirements of the job with or without reasonable accommodation, and that he was discharged solely by reason of his handicap. Brickers, 145 F.3d at 849. Plaintiff has failed to produce evidence sufficient to establish these elements of his prima facie case. As discussed

previously, plaintiff has failed to present sufficient evidence to create a genuine issue of fact on the issue of whether he was "otherwise qualified" to perform any production position at Honda. It is also uncontroverted that there were no vacant positions at the time which would trigger any duty to accommodate.

Honda has also offered a nondiscriminatory reason for plaintiff's termination. Honda has produced evidence that plaintiff's employment was terminated in accordance with its associate service policy, which states that separation from employment will result in cases where the employee is not actively employed for any reason for twelve (12) consecutive months unless the employee is on approved leave of absence due to an occupational injury or illness, serving in the armed forces, on an educational leave, or laid off. According to Yolanda Terry, this policy is consistently and uniformly applied to all associates, whether disabled or non-disabled. Terry Aff., ¶ 5. Plaintiff's employment was terminated pursuant to the associate service policy due to the fact that he had not been actively employed for twelve consecutive months. Terry Aff., ¶ 7. This evidence has not been shown to be false or a pretext.

An employer does not violate the ADA by terminating an employee in accordance with a leave of absence policy which does not distinguish between disabled and non-disabled employees. See Gantt, 143 F.3d at 1046. Guidelines issues by the Equal Employment Opportunity Commission provide: "Leave policies or benefit plans that are uniformly applied do not violate this part simply because they do not address the special needs of every individual with a disability." 29 C.F.R. pt. 1630, App. §1630.5. In Gantt, the

Sixth Circuit held that summary judgment was properly awarded to the defendant employer which terminated a disabled employee under the terms of a leave of absence policy which required termination of any employee who does not return to work at the expiration of the leave period. <u>Gantt</u>, 143 F.3d at 1046.

Honda is entitled to summary judgment on plaintiff's termination claim.

## IV. Violation of Public Policy

Finally, plaintiff asserts a claim for termination in violation of public policy under Ohio law. <u>See</u> <u>Painter v. Graley</u>, 70 Ohio St.3d 377, 639 N.E.2d 51 (1994). To establish this claim, plaintiff must show: (1) a clear public policy manifested in a state or federal constitution, statute or administrative regulation, or the common law; (2) that discharging the employee under circumstances like those involved would jeopardize the policy; (3) that the discharge at issue was motivated by conduct related to the policy; and (4) that there was no overriding business justification for the discharge. <u>Hundley v. Dayton Power & Light Co.</u>, 148 Ohio App.3d 556, 559, 774 N.E.2d 330 (2002).

The statute upon which plaintiff relies to meet the first requirement is §4112.02(A) and its prohibition against handicap discrimination. The Sixth Circuit has held that a plaintiff is not required to show all of the elements of a violation of §4112.02 in order to succeed on a claim for wrongful termination in violation of public policy. <u>See</u> <u>Plant</u>, 212 F.3d at 939. However, plaintiff must show that dismissing employees under circumstances like those involved in his dismissal would jeopardize the public policy embodied in that statute. <u>Id</u>. at 940.

37

Based on the evidence presented, and for the reasons stated above in addressing plaintiff's disability discrimination claims, plaintiff has failed to show that his termination would jeopardize the public policy embodied in §4112.02 and the Ohio cases construing that statute.  Plaintiff has not produced evidence sufficient to raise a genuine issue of fact as to whether he was "otherwise qualified" for a vacant position at Honda, or whether Honda attempted to accommodate his disability in good faith.  Honda is entitled to summary judgment on this claim.

<u>V. Conclusion</u>

For the foregoing reasons, Honda's motion for summary judgment and for leave to file a memorandum in excess of twenty pages (Doc. # 45) is granted.  Plaintiff's motion for summary judgment and for equitable relief (Doc. # 46) is denied.  The clerk shall enter judgment in favor of the defendant Honda of America Manufacturing, Inc., on plaintiff's claims.


Date: February 27, 2006          s\James L. Graham
                          James L. Graham
                          United States District Judge

38